Case number 20-5283, Pierre Ajami v. Veronica Solano. Oral argument, 15 minutes per side. Ms. Wharton for the appellate. Good morning, Your Honors. May it please the Court. I am Lindsay Wharton, pro bono counsel on behalf of Veronica Toscari Solano, appellate in this case. This Court should reverse and remand the District Court's erroneous conclusions of law because forcing an asylee to risk torture when returning to a country to adjudicate custody and thereafter to risk being denied reentry into the country of asylum puts her and her children in an intolerable situation under the Hague Convention and this Court's precedent. The lower court erred when it failed to even take that impossible choice into consideration. While the Hague Convention seeks to prevent one parent from removing a child from his or her habitual residence because the parent believes that he or she would have a more favorable custody dispute in a new country, it is not without exception. Article 13B is one such important exception. Under Article 13B, children should not be returned if there is a grave risk that their return would expose them to physical or psychological harm or otherwise place them in an intolerable situation. Article 13B is designed to take the interests of the child into account. The Article 13B is a mixed analysis of law and fact and is thus reviewed by this Court de novo. In this case, our client is a mother of two minor children who fled political persecution from the Maduro regime in Venezuela, a regime that has been described by the United States Executive Branch as responsible for the worst humanitarian crisis in the Western Hemisphere in recent memory. Let me just interrupt you a minute because you said mixed questions of law and fact. Most of these arguments that are raised in this case and similar cases about the conditions in the country and so forth and then a ruling is made whether they qualify or don't qualify, are those factual determinations? The factual determinations are the credibility of witnesses and that sort of thing, Your Honor. The actual decision of whether a child is placed at grave risk is a mixture of fact and law and the Simcox case says that that is a de novo decision for this Court. Thank you. So whatever the standard is, the District Court's ruling was based primarily on what we would consider normally credibility issues, whatever the standard of review is. Isn't that a fair characterization? The District Court did focus a lot on credibility issues, but we think that is one of the many clear errors that the Court made in that he did not account whatsoever for Ms. Iscari Solano's grant of asylum or the grant of asylum to the children as derivative asylees. And while this question has not been before this Court, the Fifth Circuit in the Sanchez v. RGL case said clearly asylum is relevant to the Article 13b determination and that Court reversed and remanded for proceedings similar to what we would ask for here, which is that the District Court needs to at least account for the relevant grant of asylum in the Article 13b determination and simply not... What did the District Court say about the fact that the mom had been granted asylum in the U.S.? In the conclusions of law and findings of fact, nothing. It simply was not discussed. So really then what you're suggesting is that because the grant of asylum to the mom means that she... and it is based apparently on persecution or likelihood of persecution by the Maduro regime in Venezuela, that because that is an important factor that the District Court did not mention at all, we should remand to the District Court to consider that? Yes, Your Honor. And you're making the argument under Article 13b, is Article 20 relevant or not? For the purposes of this case, it was stipulated that it would be only Article 13b. Stipulated... At the District Court level. At the District Court level. Yes. The issue on the asylum and its effect, that strikes me as a purely legal issue. Yes, Your Honor, I agree. So does that mean that we could decide it without remanding? I think yes, Your Honor. You could decide that asylum is relevant to the Article 13b determination and ultimately make a determination under Article 13b that having asylum and being practically unable to go to Venezuela to adjudicate a custody dispute is an intolerable situation under Article 13b and that would end this case. That's what I was just going to point out. It would be more than relevant, it would be determinative. Yes, Your Honor. So what do we know based on the record here as to the basis for the mom being granted asylum? She testified to her fear of political persecution by the Maduro regime. She testified that there is an outstanding warrant for her arrest in Venezuela. She testified as to how political dissidents are treated by the Maduro regime in Venezuela and she testified to her participation in the opposition party, Voluntad Popular, which is the opposition to the Maduro regime in Venezuela. Is the warrant for her arrest related to her political activities or her removing the children from the country? We understand that the district court didn't make a determination on that and there's no evidence that it's based on removing the children. But we understand that there is an outstanding warrant for her arrest and were she to touch down in Caracas, Venezuela, she would be arrested and likely tortured. Do we know, so my understanding of the facts is that the children were in fact taken back to Venezuela by the dad. But if the father had not taken the children back, could, but the district court had ordered that the children should be taken back as the district court did order and the stays were denied in fact by the district court and by this court. Who would be enforcing the district court's order that the children be taken back? Would that be, what I'm concerned about is the conflict potentially between the judicial branch and the executive branch because the executive branch has given asylum to this woman and to her children derivatively. So could a district court order the government to facilitate, the executive branch to facilitate the removal of the children when they have been granted asylum by the executive branch? I don't think we need to reach that specific question, Your Honor. The Supreme Court in the Chafin case said that even when children have been returned to their habitual residence nation, a case such as this one is not moot. And even if a re-return order or an order to get the children back from whatever country they are in would be ineffectual, a court can still order it. So we would ask that the court make that order and it doesn't need to get into the sort of issues of judiciary versus executive branch. But if the children are actually in Venezuela, then even with that order, that would have to be taken to Venezuela and there would have to be some ruling there. In other words, Venezuela could not honor that if they chose to. Well, we believe that the appellee in this case has already availed himself to the American court system by filing this exact case. And so there should be no reason that such an injustice would occur that he just wouldn't return with the children were he to be ordered and sanctioned by an American court. So theoretically then the Venezuelan court would be proceeding with a custody determination? Based on the district court's order currently, yes. And do you know what's happening in Venezuela vis-a-vis that? We understand that nothing is really happening in Venezuela at the moment. Our client is not able to talk to her children very often and it is very difficult to get information about what is happening to them currently in Venezuela. My memory may be a little fuzzy on this, but I thought that in the proceedings relating to her domestic situation that your client was represented by an attorney who was filing matters on her behalf. Is that not correct? There was an attorney that was able to on occasion file things on her behalf, yes. But you don't know what's happening currently? Not currently. And I see that I'm running out of time, so if it is okay with your honors I would like to reserve the rest of my time. Is sort of the linchpin or the most important part of your argument to you this asylum issue? Yes, we think that that is determinative and dispositive and a question that this court can decide. Thank you. Thank you. Good morning, your honors. May it please the court. Ashley Goins Alderson with Stites & Harbison for the APALE petitioner Mr. Pierre Salame Ajami, who is the father of the two minor children at issue. I would like to first start off with addressing some of the asylum questions that the court has raised with my opponent. The reason there is nothing in the district court's opinion about the grant of asylum specifically is because Ms. Toscari did not present proof that she had been granted asylum in the underlying case. The district court, oh sorry I interrupted you. Please go on. Until March of 2020, your honors, when the fourth day of trial had already concluded and there was a motion for stay pending, that is when Ms. Toscari first alerted the district court to the fact that asylum had been granted. That asylum had been granted in June of 2019. So there was absolutely no reason why in July, August, and December of 2019 Ms. Toscari could not have presented that fact to the district court for its consideration. Did the district court then address that on the motion for stay, the asylum issue? Your honor, he declined to consider it for the purposes of undermining his opinion. And the reason is he felt that it would be unfair because we didn't have the opportunity to cross examine any witnesses about the grant of asylum. And she had had a full and fair opportunity to present that evidence during the four day trial and she chose not to for whatever reason. She chose not to present the fact that she and the children had been granted asylum as something for the district court to consider in its hate convention decision. That's correct, your honor. Was the judge considered it forfeited or waived, the argument? I believe so, your honor, because again, we've had a four day trial where we've called in various witnesses to testify to the court. There's an astounding amount of documentation that was submitted into evidence which with these expedited cases, I felt like this was a very thorough record that for whatever reason, a choice was made by her and her lawyer to not submit that document into evidence. I will also say that whether or not a grant of asylum occurs, it's not necessarily determinative of the issue. In fact, it's not determinative of the issue. The reason is there's a different standard for granting asylum than there is for proving by clear and convincing evidence in Article 13b defense. Somebody might be granted asylum based on the preponderance of the evidence of a well-founded fear of persecution, but that doesn't necessarily mean that those facts underlying that asylum grant rise to the level of clear and convincing evidence which is required for the purposes of a Hague Convention defense. There's also an issue with, and your honors pointed out, there were several credibility findings made in this case by the district court judge. A lot of those came on cross-examination of Ms. Toscari. The fact that she did not put this document into evidence left us with no opportunity to cross-examine her on those facts. Again, I think that's why the judge declined to consider it after the close of proof in the case. How was the court alerted to grant of asylum, if not through an evidentiary presentation? With the motion to stay, your honor, there were several documents that Ms. Toscari's new counsel at the time submitted, and of course we objected. We said the proof had been closed. The court made a very thorough ruling about what exactly he was considering with respect to the motion to stay and what he was not considering. He let a lot of things come in just to show that they existed, for example, but not necessarily for any hearsay purpose because there were a lot of hearsay documents that had been filed as well. To answer your question, her new lawyer did file something, but at that point in time the judge had already issued his ruling. Did the motion for stay come after the judge had ruled? It did, your honor. We had trial, then we had written ruling, then we had motion to stay and offered the document reflecting the asylum. We got that right. That's correct. I would also point out, your honors, that at the close of proof, so after the fourth day of trial, both parties were given an opportunity to submit evidence related to the admissibility or authenticity of certain documents that were at issue. Even then, in July of 2020, there wasn't a single mention of this asylum approval document, and there was no argument that the court should consider it at that point in time. Are you contesting the validity of the grant of asylum? Your honor, we're not contesting the validity of, well, let me say it this way. I'm not contesting that asylum was granted. What we are contesting are those underlying facts. We don't know. The record does not have a shred of evidence in it to show what the INA considered when granting, what immigration considered when granting this asylum. Why could asylum be granted? Because of political persecution. Why else would it have been granted? The well-founded fear of political persecution is the basis for the grant. But what I'm trying to articulate is that the underlying facts that could potentially support a grant of asylum, those were all things that she could have, should have, and to some degree tried to assert in her Hague petition action. For example, the fact that she is a member of a political party that opposes the Maduro regime. That could potentially be a fact that would overlap with the grant of asylum issue and the Hague Convention issue. But without more than just, I'm a member of this political party that opposes Maduro, we don't rise to the level of clear and convincing evidence of an intolerable situation. Do you have any of the immigration documents other than the, what do you have that reflects the grant of asylum? Just the very short document saying it has been, your asylum petition has been granted. And there's not any detailed factual analysis about why it was granted. Is that satisfied with the authenticity of the document? Honestly, given the situation here where we have a litigant who falsified a death certificate in Venezuela in order to abscond with the children, there is a question about it. It would be pretty easy to determine its authenticity, wouldn't it? Or its lack of authenticity. Yes, Your Honor. Looking at the document itself, there doesn't seem to be any reason to doubt it. It has the A numbers of the woman and her children. It looks like asylum grants, but obviously, and it has barcode and all this kind of stuff signed by a particular person. I mean, there are all sorts of ways to check it. Is it possible or is it not possible that the grounds for asylum are broader than what would be required to be shown here to have the mother win in these proceedings? Asylum is a pretty loose concept. There's even been talk recently of looking for a better economic life to be grounds for asylum. And that was just hypothetically speaking. It didn't seem to me that would have any impact on this situation as being a bar to the children being kept by the father. I think that's correct, Your Honor. Again, we have this evidentiary burden and a looser idea of what might constitute grounds for asylum that may or may not overlap with a grave risk of harm or an intolerable defense situation. But the proof in this record was pretty scant with respect to any fear of persecution that Ms. Tescari might face if returned to Venezuela. And I'd also like to point out that the grant of asylum for the children is derivative in nature. So there's no evidence in the record to show that the children would be returned to an intolerable situation under the Hague Convention. Suppose that the mom was granted asylum because of political persecution, hypothetically. Would it be proper under Article 13b to send the children back to Venezuela and say to the mom, essentially, the district court would be saying and we would be affirming, saying to the mom, too bad that the executive branch has found that you are suffering from political persecution in Venezuela such that we grant one of our limited asylum grants to you. So if you want to get rights to your children, you're going to have to choose. Are you going to go back to Venezuela, which hypothetically has persecuted you? Or are you going to say, well, I don't want to die because that's what my risk was, hypothetically. So is that the position that you would put a mom in? Or it could be a dad. I'm just using that so that we don't get hung up on names here. With that hypothetical, Your Honor, I think the answer is still yes because the Hague Convention and ICARA is child-centric. These are hard cases, right? These are hard cases. But the fact of the matter is that we look to what's going to be intolerable for the children. And in this case, the proof in the record is replete with instances of father being able to get them medical care, medications, being able to provide groceries for them, being able to feed them. The mother conceded a lot of these things on cross-examination. I'm sorry that I can't find right off the top. What exactly does Article 13b say? Is it intolerable for the children to be sent back to Venezuela, or is it an intolerable situation? And I regret that I don't have that in front of me. I believe the language, Your Honor, is would expose the children to a grave risk of physical or psychological harm or otherwise place them in an intolerable situation. So it's child-centric. Yes, Your Honor. That's my understanding of how courts have interpreted that. I will ask your adversary this, but it strikes me that the grant of asylum means at a minimum that it would be very hard for the appellant to visit the children in Venezuela, assuming the allegations and the basis for the grant of asylum are in fact the real situation. And that would have been something that would have been relevant for the district court to consider, i.e. the difficult, if the children go to Venezuela, the future difficulty of visiting with the mother, at least in Venezuela. Do you agree that that's highly relevant to that? I would agree that that's relevant, but I would also state that the district court did consider that. Actually, on the motion to stay, one of Mother's arguments was, I'm going to be left with no mechanism to see my children if we don't stay this order pending appeal. And Judge Richardson, I think correctly, found that just because you might not be able to visit with your children in Venezuela, which may or may not be true, but if we assume that that's true, that doesn't mean that a Venezuelan court can't order some sort of visitation or custody arrangement that would permit the children to visit with their mother somewhere else, perhaps here in the United States. So that's how he addressed that issue. And Your Honors also asked a question, I believe it was you, Judge Gibbons, about the arrest warrant. And that actually was addressed on page ID number 948 in a footnote by Judge Richardson. The court notes that there may be an arrest warrant for a respondent in Venezuela. It is unclear whether any such arrest warrant would be based on her use of a false document to leave the country or on her failure to appear in court. And then he went on to conclude that the potential negative effects of a respondent from possible criminal exposure... I'm sorry. Yes, Your Honor. It's 948. And he went on to say the potential negative effects upon a respondent from possible criminal exposure in Venezuela does not rise to the level of an intolerable situation for the children sufficient for a successful affirmative defense. So that issue was addressed. And Judge Gibbons, I think you hit the nail on the head when you said it's not because of the political affiliation that she has. It's because she falsified a death certificate and then she absconded with the children. Could somebody who is suffering political persecution in order to get out of the country falsify a death certificate to get out of the country and be granted asylum notwithstanding falsifying a death certificate? Your Honor, I know there's a provision about asylum can be revoked if there's a crime that's been proven. I'm not an immigration attorney. I don't pretend to be one. So I don't exactly know the answer to that, but I think it would probably be relevant to the immigration authorities. What I'm saying is that perhaps in granting asylum, an asylum officer would say that it's not a typical false statement that would bar asylum if the asylum seeker makes the false statement in order to escape from her persecutors. And that could be, Your Honor. But with respect to any arrest warrant in Venezuela, I believe it's related to her actions with respect to removing the children unlawfully, which was stipulated to in the underlying case, not just because she's a member of the Maduro regime. It's not like Maduro has a list and she's on it. No, but if she wanted to escape, and I understand all of this is hypothetical, but if she wanted to escape from political persecution in Venezuela and she wanted to have her children with her, she would need to have a way of getting the children out of Venezuela. And I'm assuming that you have to have both parents sign on to children traveling out of the country. That's a typical kind of thing. So she hypothetically would undertake this lie that the father was dead in order for her to accomplish her effort to get her asylum in the U.S. And if, in fact, she was being persecuted, it would be an understandable lie as opposed to a grievous lie that no one could possibly endorse. I would agree with that, but I would also encourage the court to review the record because it's not the only lie or inconsistency that she's asserted. There were some other documents that the court found that he didn't think they were authentic. And some of those were in the January 2020 post-trial filings where there was an affidavit and the signatures didn't match up, and there were some other issues with documents, not just a falsified death certificate. Any further questions? Thank you. Thank you. Well, again, Your Honors, very briefly, I would like to address several of the points that were made by my opponent. First, and I think most importantly, is to correct the timeline of when asylum was presented to the district court. On the first day of trial, in Trial Transcript 104 on July 30, 2019, Ms. Descari Solano said, when I came here it was to request refuge, protection, and ask for asylum. Her attorney showed her a document and said, what is it? My political asylum having been approved. And is that also proof of the asylum being approved for your two children? Yes, that's correct, me and my two children. So to say that the district court had no knowledge of asylum until after the findings of fact and conclusions of law were issued is incorrect. Was the asylum document put into evidence at that point? There was some objection as to its authenticity, but I believe the answer is yes, that it was. And as to authenticity, I think, Judge Moore, you hit the nail on the head. There can be no question that that document is, in fact, a document from the United States Executive Branch granting asylum. I agree that it is not detailed, but it specifically says that asylum has been granted to Veronica Descari Solano and her two minor children as derivative asylees. There can be no question that it says that. Do you know whether asylum grants usually take the format of this asylum grant in terms of not saying why asylum is granted? My understanding with asylum proceedings is, if there is no hearing by an immigration judge, that it is you submit a package and you get this document back. But I don't pretend to be an expert. So asylum is granted without a hearing before an immigration judge on occasion? On occasion. And we understand that this was, you may remember, former President Trump instituted a last in, first out policy for asylum in, I believe, 2019, but it was in effect in 2020. So as to the speed, we think that explains it. How does last in, first out translate to asylum proceedings? Meaning the most recent applications get processed first, rather than the ones that have been waiting a longer time. I thought it meant the last person in the country is the first to leave. It can. The way I'm using it is in terms of these applications, Your Honor. I guess they would be entitled to a hearing of some kind before they leave. And going to the question about intolerable situation, Article 13B language does specifically refer to the children, but this court's precedent and foreign courts of sister signatories to the Hague Convention has said that a court that is practically or legally unable to adjudicate custody is an intolerable situation under Article 13B. This court said it in the Newman v. Newman case, in the Palego v. Hayes case. A Canadian court said it in Chan v. Chow, and an Australian court said it in the state of Victoria v. Ardito. And in those cases, those two foreign cases, the question was whether a parent could legally travel to the country or whether they could legally be present in a court. And that is precisely the situation here, but those are even easier questions. This is a woman who cannot travel to Venezuela full stop. She understands that she will be arrested if she steps off of a plane onto Venezuelan soil because she's an opponent of the Maduro regime. That is enough under Article 13B based on Newman v. Newman, Palego v. Hayes, and the foreign cases that I cited. So what about her lying? She lied in order to get out of Venezuela. She lied by saying that her husband, the father of the children, was dead. Well, I think there's two important points there, Your Honor. The first is the passage read by my opponent said that the district court did not know why the arrest warrant was there. He did not conclude it was because of this allegedly falsified death warrant. He also did not conclude that it was because of the political persecution. I'm not sure. I thought that what Judge Moore was asking, and maybe I misunderstood, was what significance with respect to credibility are we to attach to the fact that she was willing to falsify a document to get out of the country? What implications does that have for credibility in general? No, that wasn't my question, but you can feel free to ask that question. Well, I want to ask that question, but I don't want to ask it before you get an answer to yours, since yours was something different. Answer Judge Moore's question first, and then you can turn to mine. I'm sorry, Judge Moore, could you ask? My question was, what should we do with the fact that she lied to get out of the country by saying that the father of the kids was dead? I think there's two responses to that. The first is that document was created by the Maduro regime and magically appeared only days after it was requested. We question that document as it was created by the very regime that is persecuting her if she's there. That document meaning the death certificate? The death certificate. Secondly, on credibility, I think it is important to remember the actual practical implications of this case. Venezuela is not somewhere that you want to be. The executive branch has said so. The executive branch has even issued temporary protected status to Venezuelan nationals in the United States, saying that the situation is so dire that we are not going to return Venezuelan nationals to Venezuela until September 2022. Even if there were a falsified document, which we do not concede, a mother can be very desperate in trying to escape persecution where she fears that herself and her two children would be tortured and persecuted. Feel free to answer Judge Gibbons' question. I think my question had to do with the district court. For the district court, this case seems to have turned on credibility determinations, and your client was found not credible in a number of respects. Isn't the district court entitled to use the fact that she was willing to use a false document to get out of the country as evidence of her credibility in other respects? I think the district court was entitled to use the evidence. What I do not think the district court was entitled to do was ignore the evidence of her asylum in making these determinations that is relevant and, as Judge Gaya said, ultimately should be dispositive, specifically for the question of intolerable situation under Article 13b. Thank you. We've taken you above your time. Thank you. Both for your arguments, and the case will be submitted. Would the clerk call the next case, please?